**ST. LOUIS-SAN FRANCISCO RAIL-WAY COMPANY, a corporation, Appellant,**

v.

**Peter C. WALTER, Betty Walter Allen, Jean Walter Davisson, and Daisy E. Walter, Appellees.**

**No. 6922.**

United States Court of Appeals
Tenth Circuit.

May 25, 1962.

Grey Satterfield, Oklahoma City, Okl. (Ernest D. Grinnell, Jr., St. Louis, Mo., and Franklin, Harmon & Satterfield, Oklahoma City, Okl., were with him on the brief) for appellant.

John Ladner, Jr., Tulsa, Okl. (Ladner, Livingston & Ladner, Tulsa, Okl., were on the brief) for appellees.

Before LEWIS, BREITENSTEIN and HILL, Circuit Judges.

BREITENSTEIN, Circuit Judge.

The issue is the ownership of a tract of land included in a grant to the predecessor of the Railroad and claimed by the appellees-plaintiffs (herein referred to collectively as the Walter Group) on the grounds that the grant was an easement, that the easement has terminated, and that they, as owners of the servient estate, hold the tract free of the easement. The Railroad contends that the easement has not terminated and that, if it has, the Railroad has title by adverse possession. Each party sought to quiet its title. The trial court entered an appropriate decree in favor of the Walter Group. Jurisdiction is based both on diversity and on the fact that the controversy arises under the laws of the United States.

The tract is in Oklahoma and within an area formerly under the control of the Creek Nation of Indians. By treaty concluded with the United States on June 14, 1866, the Creek Nation granted a right of way through its lands for railroad purposes subject to the laws of the United States and regulations of the Secretary of the Interior.[1] The Act of July 27, 1866,[2] granted to the predecessor of the Railroad a 200-foot right of way for a railroad across the public domain and "all necessary grounds for station-buildings, workshops, depots, machine-shops, switches, side-tracks, turn-tables, and water-stations."

The Railroad constructed its line through the area during 1884–1886. In 1901 its Chief Engineer filed, and the Secretary of the Interior approved, a plat of "Stockyards Near Red Fork Station," which covered an area 200 feet by 2,000 feet adjoining the right of way. Stockyard facilities were built on the tract about 1902 but removed partially in 1916 and completely in 1925 after which no stock pens were on the tract but until 1950 stock pens were maintained on the adjoining right of way.

The stockyards tract and the right of way run diagonally across a 40-acre tract to which one Pleasant Grayson obtained title as a Creek allottee by a deed which was executed in 1903 and which conveyed the 40 acres, described as the Northeast Quarter of the Northwest Quarter of Section 33, "less 6.67 acres occupied as right of way and stockyards by St. Louis and San-Francisco Railroad." These 40 acres were later platted, and the Walter Group, having title derived from Grayson, owns Lots 1 and 2. It claims 2.87 acres of the stockyards tract adjoining those lots. Herein the portion of the stockyards tract claimed by the Walter Group will be referred to as the disputed area.

---

1. 14 Stat. 785, 787.

2. 14 Stat. 292, 294.

By the Act of April 26, 1906, Congress made final disposition of the affairs of the Five Civilized Tribes of Indian Territory. The Creek Nation was one of those tribes. Section 14 of that Act [3] provided that as to lands reserved from allotment because of the right of any railroad "in the nature of an easement for right of way, depot, station grounds, water stations, stock yards * * *" title may be acquired by the railroad under regulations prescribed by the Secretary of the Interior but if not so acquired or if the railroad "shall cease to use such land for the purpose for which it was reserved, title thereto shall thereupon vest in the owner of the legal subdivision of which the land so abandoned is a part" with certain exceptions which are not pertinent here.

The first question is the nature of the right which the Railroad secured to the stockyards tract. As the Railroad did not take advantage of the provision of § 14 of the 1906 Act to acquire title under regulations of the Secretary, we are not concerned with what right might have been secured had it done so. Title to the lands granted was imperfect until they were identified by the definite location of the Railroad.[4] In considering the 1866 Act and another Act the Supreme Court said [5] that "when the maps of definite location were filed and approved the grants took effect."

The plat of the stockyards tract has the designation "Stockyards 1½ Miles West of Red Fork," and bears a certificate stating that a survey has been made of the grounds of the stockyards near Red Fork station which have been selected and occupied by the Railroad under the Creek Treaty of June 14, 1866, and that the grounds so selected are required by the Railroad for the uses contemplated by the Treaty. This was a taking for a specific purpose, use as stockyards. As the Railroad failed to obtain title under § 14 of the 1906 Act it held an easement for the particular purpose for which the land was taken.[6] Upon the termination of the use for which the easement was taken, the owner of the subservient estate holds title unencumbered by the easement.

The argument of the Railroad that the easement was for general railroad purposes and has not terminated because portions of the original tract are used by shippers over the railroad is unconvincing. None of the cases cited by the Railroad in support of this contention apply because they do not concern statutes or grants similar to those here presented. The claim of the Railroad that it now has an easement over the disputed area is without merit.

The Railroad urges that if its claim of an easement is not sustained, it has title to the disputed area by open, notorious, and adverse possession for

3. 34 Stat. 142.

4. Wisconsin Central Railroad Company v. Price County, 133 U.S. 496, 509, 10 S.Ct. 341, 33 L.Ed. 687.

5. Southern Pacific Railroad Company v. United States, 183 U.S. 519, 530, 22 S.Ct. 154, 46 L.Ed. 307.

6. United States v. Magnolia Petroleum Co., 10 Cir., 110 F.2d 212, 218. While neither that case nor such cases as Fitzgerald v. City of Ardmore, Oklahoma, 10 Cir., 281 F.2d 717; Town of Maysville, Oklahoma v. Magnolia Petroleum Company, 10 Cir., 272 F.2d 806; City of Wilburton. Oklahoma v. Swafford, 10 Cir., 253 F.2d 479; Chickasha Cotton Oil Company v. Town of Maysville, Oklahoma, 10 Cir., 249 F.2d 542; St. Louis-San Francisco Railway Company v. Town of Francis, 10 Cir., 249 F.2d 546; Seminole Nation v. White, 10 Cir., 224 F.2d 173, certiorari denied 350 U.S. 895, 76 S. Ct. 153, 100 L.Ed. 787; and United States v. Drumb, 10 Cir., 152 F.2d 821, involved the 1866 Treaty and Act, the statutes which were considered in those cases are in all important respects similar to those now under consideration The holdings have been uniform that when a railroad failed to acquire title under § 14 of the 1906 Act, the right acquired was an easement and upon the termination of the easement title vests in the adjoining landowner unless the land is within a municipality. The land under contest is not within a municipality.

more than 15 years.[7] No stockyard facilities were on the stockyards tract after 1925 but some remained on the adjoining right of way until 1950. The only boundary markers for the tract have been a line of unwired fence posts. A portion of the tract outside of the disputed area has been leased since 1924, first to a tool company and then to a cement company. Another portion partly adjacent to the land of the Walter Group was leased from 1944 to 1956 by a wood products firm and since 1958 by a grain storage company. None of these leases covered the entire disputed area.

■ The claim is that possession of part of the stockyards tract by the Railroad's lessees is possession of the whole tract because the Railroad had color of title under the grant made pursuant to the 1866 Act. In Fife v. Barnard, 10 Cir., 186 F.2d 655, 660, a case arising in Oklahoma, we said that to sustain a prescriptive title under color of title a claimant must have an honest belief based on reasonable grounds that, when he obtained his grant relied on as color of title, he acquired a valid title although investigation later proved it otherwise. If a grant may be color of title for more than it professes to grant, a point which we do not decide, the necessity of adverse possession remains. The grant to the Railroad was of a valid easement which gave the Railroad a dominant right for the purposes of the easement. A claim of adverse possession could arise only when the Railroad asserted a right greater than that granted by the easement.

■ Oklahoma has held that adverse possession requires an entry based on claim of right or after entry there must be a distinct denial or repudiation of the right of a cotenant.[8] If it be taken that the grant under the 1866 Act was of

such a nature that it might be color of title upon which to base a claim of adverse possession, that adverse possession can begin only when there occurred a distinct denial or repudiation of the right of the owner of the subservient estate to hold free of the easement when the purpose of the easement ended.

■ To establish adverse possession the claimant has the burden of proving such a change in the character of the possession as to preclude all doubt as to the nature of the holding or the want of knowledge on the part of owner.[9] The leases on portions of the stockyards tract outside of the disputed area were not notice to the Walter Group as to the intention of the Railroad with regard to the disputed area. The possession under the unrecorded lease to the wood products company covering a part of the disputed area ran only 12 years. Further, under Oklahoma law the abandonment of an easement is based not only on actual relinquishment but also on intent to abandon.[10] The fact that the Railroad maintained stock pens on its right of way adjoining the stockyards tract created an uncertainty as to the intent of the Railroad in regard to the use of the area as stockyards. In all the circumstances the Railroad did not have the clear, positive, and actual adverse possession required to sustain the burden of proof [11] on its claim of a prescriptive right.

Finally, the Railroad says that even if its claims fail the trial court awarded to the Walter Group more than it is entitled to as the adjoining landowner. The allotment deed covered the Northeast Quarter of the Northwest Quarter of Section 33. This was platted and the Walter Group owns Lots 1 and 2. These are in the northwest corner of the allotted 40-acre tract and together form a triangle. It has as its base the northwest-

7. 12 O.S.1961 § 93(4).

8. Wilcox v. Wickizer, 266 P.2d 638, 641–642 (Okl.); Morris v. Futischa, 194 Okl. 224, 148 P.2d 986.

9. Acton v. Culbertson, 38 Okl. 280, 132 P. 812, 815.

10. Kansas O. & G. Ry. Co. v. Rogers, 200 Okl. 111, 191 P.2d 209, 211.

11. McGrath v. Eichhoff, 187 Okl. 64, 100 P.2d 880, 885.

erly boundary of the stockyards tract which passes through the allotted tract diagonally from northeast to southwest. The north boundary of the triangle is a section-line road and the west boundary is the same as that of the allotted tract. The disputed area is in the shape of a trapezoid with the shorter of the two parallel sides being the base of the triangle formed by Lots 1 and 2. The non-parallel sides are respectively the boundary of the allotted tract on the west and the section-line road on the north and thus are extensions of the sides of the triangle.

■ The Railroad says that the area vesting in the Walter Group should be bounded on the east by a north-south line, parallel to the west line of the triangle, extending from the northeast corner of the triangle to the southerly boundary of the stockyards tract, on the south by the southerly boundary of the stockyards tract, on the west by an extension of the west line of the triangle to the southerly boundary of the stockyards tract, and on the north by the northerly boundary of the stockyards tract. This would substantially reduce the award to the Walter Group. Recognizing the difficulty inherent in the determination of the land to be awarded to an adjacent landowner when the abandoned easement intersects a lot diagonally,[12] we are of the opinion that the court correctly interpreted and applied § 14 of the 1906 Act which provides that upon the abandonment of an easement title vests in the "owner of the legal subdivision of which the land so abandoned is a part." The Walter Group owns all that portion of the legal subdivision northwesterly of the abandoned tract and of the existing railroad right of way except for the section-line road. We are not concerned with what the situation might be if the abutting landowner held a small triangular shaped portion of the legal subdivision with side lines not conterminous with the side lines of the legal subdivision.

Affirmed.

12. State ex rel. Patterson v. Superior Court for King County, 102 Wash. 331, 173 P. 186, 189.